IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILEY JOSEPH SMITH                     *

     Plaintiff         *

    vs.                    *    CIVIL ACTION NO. MJG-15-2232

THE PNC FINANCIAL SERVICES             *
GROUP, et al.
          *
    Defendants
*  *  *  *  *  *  *  *  *

<u>MEMORANDUM & ORDER RE: SUMMARY JUDGMENT</u>

  The Court has before it Defendants' Motion for Summary

Judgment [ECF No. 31], Plaintiff's Cross-Motion for Summary

Judgment [ECF No. 34], and the materials submitted relating

thereto.[1]  The Court has reviewed the exhibits and considered the

materials submitted by the parties. The Court finds a hearing

unnecessary.


I. <u>BACKGROUND</u>

  Plaintiff Wiley Joseph Smith ("Smith") worked for Defendant

The PNC Financial Services Group, Inc. ("PNC") from 1990 until

September 5, 2013, at which time he was a Regional Manager II in

PNC's Realty Services.  Smith was a participant in PNC's short-

---

[1] The cross-motions for summary judgment were deemed to be
resubmitted pursuant to the April 7, 2017 stipulation that
clarified the parties.  Stipulated Order Nunc Pro Tunc, ECF No.
45.

and long-term disability plan, a self-funded plan under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 et seq. Smith was diagnosed with depression and anxiety in 2008 and was receiving treatment, but his condition worsened in August 2013, when he became unable to continue performing his job duties as a result of disabling major depression and panic disorder. Smith was granted short-term disability benefits beginning on September 5, 2013. He has never returned to work, and the record contains no evidence indicating that a return to work is reasonably feasible.

During the period of short-term disability, Smith applied for long-term disability ("LTD") benefits to commence on December 4, 2013, after the 91-day elimination period covered by the short-term disability benefits. Defendant Liberty Life Assurance Company of Boston ("Liberty Life"), the claims administrator of the policy under which benefits are payable, denied Smith's claim for benefits.

Smith has brought the instant lawsuit against Defendants PNC, Liberty Life, and The PNC Financial Services Group, Inc. and Affiliates Long-Term Disability Plan ("the Plan") (collectively "Defendants") under ERISA, 29 U.S.C. § 1001, et seq., and more specifically, ERISA § 502, 29 U.S.C. § 1132. Smith seeks a declaration of rights under the long-term

disability plan at issue, payment of all disability insurance benefits due and owing plus interest, and an award of attorney's fees and costs.

A.    <u>The Benefits Plan</u>

The Plan is an employee welfare benefits plan as defined by ERISA, 29 U.S.C § 1002(1).  The Plan provides full-time, salaried employees who are totally disabled due to injury or illness for longer than ninety-one days (the "Elimination Period") with LTD benefits of up to 60% of their base salary.[2]

To qualify for LTD benefits, an employee covered by the Plan must meet the definition of LTD.

> For disabilities that extend beyond 91 consecutive calendar days and are considered long term, the definition of disability is as follows:
>
> **For the first 24 months (from the date LTD benefits begin):** you are disabled if your disability makes you unable to perform the material or essential duties of your own occupation as it is normally performed in the national economy.
>
> . . . .
>
> The claims administrator determines whether your disability meets these definitions.

---

[2]    Participants may elect to purchase an additional 10% of LTD coverage, for a total LTD benefit of 70% of their base salary, but Smith did not make this election..

AR 164, ECF No. 16.   The Plan also provides that LTD benefits paid due to a mental illness will stop after 24 months, unless certain circumstances exist, such as confinement in a hospital or institution.   AR 170.

     B.   Smith's "Occupation"

     Smith was employed as a Regional Manager II in PNC's Realty Services line of business.   The job is a "[s]enior level operations position with direct responsibility for all day-to-day facility management activities for a portfolio of assigned buildings."   AR 13.   This includes "interaction with outside property management companies, end-users, tenants, vendors/contractors, problem resolution, and ongoing construction/maintenance projects."   AR 14. The job's essential functions are described as requiring "significant organizational and time management skills" and are considered "critical to the well being of the company."   AR 14.   Also, close monitoring of expenses is considered critical with direct responsibility for a budget of $20-50 million dollars per year and shared responsibility for capital/expense projects in excess of $10 million dollars.   AR 15, 18.   "The requirements of a Regional Manager II are particularly complicated, requiring the

management of numerous sites spread out over a large geographic footprint." AR 17.

Specific skills and competencies required to perform the job are stated to include:

> Must have demonstrated strong oral and written communications skills, leadership, and decision making abilities. Must be able to assess strategic problems and make accurate decisions with significant financial and risk implications. Must be team oriented and have an ability to provide exceptional service to customers and service partners. Must also have the ability to balance increased workload due to the sheer number of properties being managed. The ability to identify opportunities, research, analyze, question information and problem solve is essential. Obtains information from staff, service partners, consultants, vendors and determines appropriate course of action. Must be able to react to emergencies in a decisive manner. Interacts with all levels of management, including Corporate CEOs and LOB heads. Also interfaces with third parry property management firms, all of levels of end users, and various outside consultants, vendors, contractors, code officials, and suppliers.

AR 18.

### C. Illness and Short-term Disability

Since 2008, when Smith was 55,[3] he has experienced recurrent major depression and has been receiving treatment for depression and anxiety. AR 66. In August 2013, he experienced a

---

[3]    Smith was born in 1953. AR 53.

recurrence of symptoms including "sense of dread, chest pain, difficulty thinking and getting thoughts out, and panic attacks." AR 66. He was unable to function at work and was advised by his treating doctor, Stephen W. Saunders, M.D. ("Dr. Saunders"), to remain off work and avoid all stressors. AR 66. He was treated with two antidepressants, an anti-anxiety medication, and a stimulant. AR 66.

Dr. Saunders met with Smith again in October and on November 21, 2013, at which times Dr. Saunders noted that Smith was in "partial remission only." AR 66. In Dr. Saunders' letter of December 4, 2013, he summarized that Smith "appears disabled from working in his previous employment, and also any employment at this time." AR 66.

Smith stopped working on September 4, 2013 and was granted short-term disability benefits beginning on September 5, 2013 ("Date of Disability"). AR 1, 8. Based on Smith's Date of Disability, the 91-day Elimination Period ended on December 5, 2013, which is also the LTD effective date. AR 1, 164.

D.   LTD Investigation

    1.   Initial Review

Liberty Life reviewed the records that Smith provided in support of his short-term disability claim, which included Dr.

Saunders' Office Visit notes.  AR 19-22.  Liberty Life wrote to
Smith on November 12, 2013 requesting further information and
documentation that it needed for making an LTD claim
determination.  AR 23-24.  Smith provided the requested
documents, including Smith's completed Activities Questionnaire,
AR 54-56, and records from Dr. Saunders, AR 58-61 and 65-71, and
he spoke with Liberty Life by telephone on November 15, 2013, AR
6-9.

Smith's own statement explained what prevented him from
working:

> My depression and anxiety make it very
> difficult for me to interact with people in
> work situations or to handle multiple tasks
> at one time.  When anxiety and panic set in
> I become forgetful and cannot function
> normally.

AR 56.

Liberty Life referred Smith's LTD claim for a psychiatric
medical review to determine if the record supported any
impairments that translated to restriction and limitations.  AR
72. The review was performed by Dr. Roland Segal ("Dr. Segal"),
who opined in his December 17, 2013 report that the medical
records supported a diagnosis of major depressive disorder and
generalized anxiety disorder.  AR 75-78.  Dr. Segal reported
there was evidence of impairment through October 1, 2013, but
not thereafter.  AR 75-78.  Dr. Segal added that there was no

evidence that the prescribed medications caused any impairment. AR 75-78. Dr. Segal misinterpreted some of Dr. Saunders' notes, reading the notes as indicating that Smith "was stressed by multiple tasks of buying a house and wanting to attend a nursing school and change working to part time." AR 76, see also AR 83 ("The claimant is apparently buying a house and is either thinking of attending nursing school or is already attending nursing school.") In actuality, Dr. Saunders' notes indicated that Smith's son (not Smith) was buying a house, and Smith's daughter (not Smith) was entering a nursing program. AR 70, 107.

Dr. Saunders completed an Attending Physician's Statement on November 21, 2013. AR 60-61. On the form, Dr. Saunders indicated that Smith had a Class 4 Mental/Nervous Impairment, "Patient is unable to engage in stressful situations or engage in interpersonal relations (marked limitations)." AR 61.

Dr. Saunders also provided a medical summary letter dated December 4, 2013, which stated:

> He went off work and was advised to remain off work and avoid all stressors [u]ntil completely being recovered. He was seen by me July 2013, September 2013, Oct 2013, and lastly 11-21-13. At that time he was being treated with 2 antidepressants, an anti-anxiety medication, and a stimulant, and was in partial remission only.

8

> In summary, he appears disabled from working
> in his previous employment, and also any
> employment at this time.

AR 66.

Although Dr. Segal was asked to make at least three

separate attempts to contact Dr. Saunders by telephone, he was

unable to make the contacts. <u>See</u> AR 75-76, 82-83.[4] Dr. Segal

sent a letter to Dr. Saunders on December 17, 2013, stating Dr.

Segal's opinion that there was no impairment after October 1,

2013, and asked Dr. Saunders to verify his understanding and

provide additional information if any disagreement. AR 79-80.

Dr. Saunders responded with a brief hand-written sentence on the

bottom of the letter stating: "Note- his symptoms improved when

the stress was relieved! (<u>not</u> at work)".  AR 81 (emphasis in

original).

Dr. Saunders called Dr. Segal on December 26, 2013.  AR 84.

Dr. Segal updated the file with a memorandum stating that Dr.

Saunders communicated that Smith "was better at a certain point

'because he was not working and did not have a stress of that

---

[4]    "I called Dr. Saunders to discuss Mr. Smith current
psychiatric condition, severity of symptoms, and the impact of
these symptoms on daily level of functioning, her [sic] capacity
to perform the duties of occupation, possible restrictions, and
prognosis. Unfortunately, contact was not made." AR 76.
    "The case manager wanted three phone calls to the provider.
I called Dr. Saunders on 12/17/13 at 9:20am and sent a fax on
12/17/13 at 9:40am. I called again on 12/24/13 at 9:00am and set
[sic] a fax on 12/24/13 at 9:30am. I called again on 12/24/13 at
12pm."  AR 83.

particular job, and that is the reason for his improvement.'

This information does not change my opinion as it is outlined in

the original memorandum on December 17, 2013." AR 84.  By

letter of December 30, 2013, Smith was advised that his LTD

claim was denied because he did not meet the Plan's definition

of disability, and impairment was not supported beyond October

1, 2013.  AR 86-87.

### 2.   Smith's Appeal

On January 9, 2014, Smith sent a letter to Liberty Life to

appeal the denial of his claim.  AR 90.[5]  He wrote a follow-up

letter on January 15, 2014, providing information that he

indicated was either missed, ignored, or misinterpreted by Dr.

Segal.  AR 94-95.  Smith specifically clarified the misleading

statements in Dr. Segal's report regarding Smith's buying a

house and going to nursing school.  AR 95.  He also identified

restrictions from Dr. Saunders that appeared to have not been

taken into consideration. AR 94.

---

[5]   On January 30, 2014, Smith also filed a formal complaint
with the Maryland Insurance Administration ("MIA") concerning
the "careless and inaccurate manner" with which Liberty handled
his claim and asking for a "fair and accurate review" of his
claim.  AR 123-131.  Liberty Life responded to MIA's inquiry by
letter on February 19, 2014, advising MIA that it did not have
jurisdiction but adding, as a courtesy, that an appeal was in
progress.  AR 132.  MIA advised Smith by letter on February 21,
2014 that it did not have jurisdiction over the Plan.  AR 138.

On January 20, 2014, Dr. Segal provided an addendum to his report, noting that his December 26, 2013 addendum had not made it into the file, nor had Dr. Saunders' brief written response to Dr. Segal's letter: "His symptoms improved when the stress was relieved! (not at work)." AR 119.  Dr. Segal noted that his opinion had not changed: "In conclusion, the medical evidence and communications with Dr. Sanders [sic] confirms the opinion as outlined in the original memorandum that there is no medical evidence of psychiatric impairment since October 1, 2013." AR 119.

Smith's LTD claim file was referred to Liberty Life's appeals unit, and a letter was sent to Smith on January 22, 2014, stating that a decision is generally provided in 45 days, but no longer than 90 days.  AR 120.  On February 26, 2014, Liberty Life referred Smith's LTD claim file to Behavioral Management, Inc. ("BMI"), an independent vendor, requesting a review to be conducted by an independent physician that was board-certified in psychiatry.  AR 133-136.  Liberty Life also sent a letter to Smith on February 26, 2014, advising him that his medical records had been referred for further medical review, and a decision would be rendered within the 90-day deadline.  AR 137.

The independent review was assigned to Dr. Sandra Kalnins
("Dr. Kalnins").  AR 139-153.  Dr. Kalnins spoke with Dr.
Saunders on March 5, 2014, and summarized the conversation by
letter dated March 6, 2014.  AR 139-140.  Dr. Saunders indicated
that he disagreed with Dr. Segal, that his records had been
misinterpreted, and that he did not consider Smith capable of
returning to work.  AR 139-140.  Dr. Saunders suggested that it
may be helpful for Dr. Kalnins to interview Smith.[6]  AR 140.  Dr.
Kalnins also appeared to be under the false impression that
Smith had considered going to nursing school himself.  AR 139.
Dr. Kalnins reviewed Dr. Saunders' records, Dr. Segal's review
and correspondence, Smith's job description, and other documents
from Smith's LTD claim file. AR 145-147.

Dr. Kalnins provided a written report to Liberty Life on
March 13, 2014.  AR 145-149.  Dr. Kalnins' review stated:

> The available records and
> teleconference information support diagnoses
> of recurrent major depression and anxiety
> disorder. The records support impairing
> levels of symptoms from 9/5/13 until the
> next psychiatric visit on 10/1/13, when the
> claimant's mood was improved and no
> treatment changes made. The records and the
> teleconference information from Dr. Saunders
> do not provide objective evidence of severe
> and persistent mood, cognitive, or
> behavioral symptoms preventing the claimant
> from functioning. Treatment was not

---

[6]   Dr. Kalnins' records indicate that she did not interview
Smith. AR 145-149.

consistent with impairing levels of
symptoms, where the following would be
expected: frequent psychiatric visits with
aggressive medication adjustments,
documentation of severe and persistent
psychiatric symptoms, ongoing intensive
therapy, and referrals to higher levels of
treatment such as IOP, PHP, or
hospitalization if symptoms were persisting.

In teleconference, Dr. Saunders
indicated that the claimant was improved
when he was placed out of work. The
psychiatrist describes the placement out of
work as the treatment intervention without
explaining how that could be considered
active psychiatric treatment.

The records support impairing levels of
depression and anxiety from 9/5/13 to
10/1/13. These symptoms would interfere in
the claimant's ability to maintain stable
emotions, make complex decisions,
concentrate adequately on complex tasks, and
maintain stable interpersonal interactions.
In an office visit on 10/1/13, the
claimant's mood was described as better and
no treatment changes were made. The records
do not support severe and persistent mood,
cognitive, or behavioral symptoms beyond
10/1/13 and do not indicate levels of
psychiatric treatment expected with
impairing symptoms. The psychiatrist
indicated that there was no return to work
plan.

AR 147-148.

Liberty Life sent Smith a letter on April 10, 2014,

upholding its previous determination to deny Smith's LTD claim.

AR 154-157.

3.    Request for Additional Review

In early 2015, Smith sought an additional administrative review through his attorney, providing documentation of his daughter's nursing program and his son's house purchase, and offering to provide updated psychiatric information for Liberty Life's review to establish his continued disability.  Am. Compl. ¶ 16, AR 2 (Claim Note 49, 50, referencing letter from attorney dated February 11, 2015).  Liberty Life advised by letter to Smith's attorney that there would be no further appeal review. AR 2 (Claim Note 50).

E.    Procedural Background

Having exhausted his administrative remedies under the Plan, Smith filed the Complaint [ECF No. 1] on July 29, 2015 and the First Amended Complaint [ECF No. 11][7] on November 19, 2015. On January 18, 2016, Defendants filed an Answer [ECF No. 19], and PNC and Liberty filed a Motion to Dismiss Plaintiff's Amended Complaint [ECF No. 20]. PNC and Liberty moved to dismiss on the basis that a claim for LTD benefits under the Plan may be directed only against the Plan, and not against PNC or Liberty Life.  PNC and Liberty maintain that they are neither proper

---

[7]    Deleting reference to the provision of ERISA relating to obtaining other equitable relief and renaming PNC Financial Services Group, Inc. as Plan Administrator rather than Plan Sponsor (although it is both).

parties nor defendants, but the Plan is the only proper defendant. After a telephone conference, the Court set a schedule for Defendants to file a summary judgment motion that could potentially moot the motion to dismiss and, accordingly, dismissed the motion without prejudice.  Order re Dismissal Motion, ECF No. 29.  The Court allowed Defendants to reinstate the dismissal motion without the need for further briefing at the time of filing a summary judgment motion.  Id.  Defendants then filed a joint Answer [ECF No. 30] on March 24, 2016.

Defendants' Motion for Summary Judgment [ECF No. 31] was filed on June 30, 2016.  Defendants also renewed their Motion to Dismiss [ECF No. 20], which requested that Defendant's Amended Complaint be dismissed with prejudice.  Smith responded with a cross motion for summary judgment [ECF No. 34].

On March 21, 2017, the Court entered its Memorandum and Order Re: Summary Judgment [ECF No. 42] denying without prejudice both Defendants' motion and Plaintiff's cross-motion, in order to provide the opportunity for the parties to resolve an outstanding issue regarding the status of the Plan as a party to the case.  Also on March 21, 2017, the Court denied PNC's and Liberty's Motion to Dismiss Plaintiff's Amended Complaint. Memorandum and Order Re: Dismissal Motion, ECF No. 43.

On April 7, 2017, Defendants filed, and the Court approved, a Stipulated Order Nunc Pro Tunc [ECF No. 45], establishing that the parties to the case and the motions included the Plan, and resubmitting the cross-motions for summary judgment.  The motions are now ripe for decision.

## II.   APPLICABLE STANDARDS OF REVIEW

### A.   Summary Judgment Standard[8]

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  The Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  See,

---

[8]   The Court notes that since this case arises under ERISA, it must evaluate the summary judgment motions in the context of the proper standard of review under ERISA.

e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986);

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  Thus,

in order "[t]o defeat a motion for summary judgment, the party

opposing the motion must present evidence of specific facts from

which the finder of fact could reasonably find for him or her."

Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999)

(emphasis added).

When evaluating a motion for summary judgment, the Court

must bear in mind that the "[s]ummary judgment procedure is

properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole,

which are designed 'to secure the just, speedy and inexpensive

determination of every action.'"  Celotex, 477 U.S. at 327

(quoting Fed. R. Civ. P. 1).

"Cross motions for summary judgment 'do not automatically

empower the court to dispense with the determination whether

questions of material fact exist.'" Equal Rights Center v.

Archstone Smith Trust, 603 F. Supp. 2d 814, 820 (D. Md. 2009)

(quoting Lac Courte Oreilles Band of Lake Superior Chippewa

Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983)). Rather,

the court must examine each party's motion separately and

determine whether summary judgment is appropriate as to each

under the Rule 56 standard.  Desmond v. PNGI Charles Town
Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).  The court
may grant summary judgment in favor of one party, deny both
motions, or grant in part and deny in part each of the parties'
motions.

### B.  Denial of ERISA Benefits

"In the ERISA context, courts conduct de novo review of an
administrator's denial of benefits unless the plan grants the
administrator discretion to determine a claimant's eligibility
for benefits, in which case the administrator's decision is
reviewed for abuse of discretion." Cosey v. Prudential Ins. Co.
of Am., 735 F.3d 161, 165 (4th Cir. 2013)(citations omitted).
Thus, a court reviewing a plan administrator's denial of
disability benefits under ERISA must first determine de novo
whether the "plan's language grants the administrator . . .
discretion to determine . . . eligibility for benefits."
Gallagher v. Reliance Standard Life Ins. Co., 305 F.3d 264, 268
(4th Cir. 2002).  The grant of discretion must be clear, but "no
specific words or phrases are required." Cosey, 735 F.3d at
165.

Here, the Plan states:

> The Plan Administrator shall have the
> exclusive discretionary authority to

> determine eligibility for benefits under the
> Plan, to construe the terms of the Plan and
> to determine any question which may arise in
> connection with its operation or
> administration, except to the extent that
> the Plan Administrator has authorized the
> claims administrator to make such
> determinations. . . . The Plan Administrator
> may delegate any of its duties hereunder to
> person or persons it may designate from time
> to time.
>
> . . . .
>
> a review by a court of law shall be limited
> to the facts, evidence and issues presented
> to the Plan Administrator during the Plan's
> claims and appeal procedure and shall be
> limited to a determination of whether the
> Plan Administrator's decision regarding the
> claim was arbitrary and capricious.

AR 176-177. Liberty Life and PNC entered into an Administrative

Services Only Agreement [AR 182-202], under which Liberty Life

assumed discretionary authority to construe and interpret the

terms the Plan, as well as to evaluate and decide all

questions of eligibility and/or entitlement to LTD benefits

under the Plan.[9]

---

[9]    Specifically, "[w]hile the Agreement is in effect, Liberty
will accept for processing and payment or denial, all claims for
benefits under the Plan for which proof of claim is furnished in
a form or format satisfactory to Liberty.  In processing,
reviewing and administering claim submissions Liberty shall make
the initial decision whether a claim should be paid under the
plan. In addition, . . . Liberty shall assume the responsibility
of the "appropriate named fiduciary" under Section 503(b) of
ERISA to provide a full and fair review of denied claims. In
performing such duty, Liberty shall have the authority to
construe any disputed and doubtful Plan terms subject to the

The Court accepts the parties' agreement that the arbitrary and capricious standard of review governs Smith's claim for LTD benefits.  See McKoy v. Int'l Paper Co., 488 F.3d 221, 223 (4th Cir. 2007); Defs.' Mot. 20, ECF No. 31-1; Pl.'s Opp'n & Cross Mot. 5-7, ECF No. 34-1.  Smith contends that the Court must also take into consideration that Defendants had an inherent conflict of interest based on his allegation that the plan administrator had a dual role of both evaluating and paying benefits claims. Pl.'s Opp'n & Cross Mot. 5-7 (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008)).  The Fourth Circuit, however, concluded that, based on the holding in Glenn, "courts are to apply simply the abuse-of-discretion standard for reviewing discretionary determinations by [the] administrator, even if the administrator operated under a conflict of interest."  Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008).[10]

---

right of the Sponsor to provide guidance . . . .  Liberty shall be deemed to have properly exercised such authority unless it has abused its authority by acting arbitrarily and capriciously." AR 193.

[10]    Further, many of the cases addressing a plan administrator with a conflict of interest involve an administrator "pay[ing] benefits out of its own pocket."  See, e.g., Glenn, 554 U.S. at 108.  Here, PNC funds the trust that pays Plan benefits, while Liberty Life denied Smith's claim and appeal.  If the Court considers a conflict of interest, it is only as "one factor, among many, in determining the reasonableness of the discretionary determination."  Champion, 550 F.3d at 359.

C.    Abuse of Discretion Standard

When reviewing a denial of benefits under ERISA for abuse of discretion, a "court will set aside the plan administrator's decision only if it is not reasonable." DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011). A "decision is reasonable 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" Id. (citation omitted). Substantial evidence is "'evidence which a reasoning mind would accept as sufficient to support a particular conclusion.'" Id. (citation omitted).

Under the abuse of discretion standard, a "court is not permitted to re-weigh the evidence itself." See Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 325 (4th Cir. 2008). Nor may the court "substitute [its] own judgment in place of the judgment of the plan administrator." Williams v. Metro. Life Ins. Co., 609 F.3d 622, 630 (4th Cir. 2010). Thus, as long as the plan administrator's decision was reasonable, a court "will not disturb [the] decision . . . even if [it] would have come to a contrary conclusion independently." Id.

Factors to be considered in determining the reasonableness of a plan administrator's decision include, inter alia:

　　　　(1) the language of the plan;

　　　　(2) the purposes and goals of the plan;

21

(3) the adequacy of the materials considered
to make the decision and the degree to which
they support it;

(4) whether the fiduciary's interpretation
was consistent with other provisions in the
plan and with earlier interpretations of the
plan;

(5) whether the decisionmaking process was
reasoned and principled;

(6) whether the decision was consistent with
the procedural and substantive requirements
of ERISA;

(7) any external standard relevant to the
exercise of discretion; and

(8) the fiduciary's motives and any conflict
of interest it may have.

Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan,
201 F.3d 335, 342-43 (4th Cir. 2000).

III. DISCUSSION

    A.   Full and Fair Review

        1.   Procedural

"ERISA requires plan administrators to provide participants with a 'full and fair review' of any adverse benefits determination." Clarke v. Unum Life Ins. Co., 852 F. Supp. 2d 663, 676 (D. Md. 2012)(quoting 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(f)-(g).). For a plan administrator's review of a claim for benefits to be "full and fair," the administrator must

"establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan." 29 C.F.R. § 2560.503-1(h)(1). In cases where there is a procedural ERISA violation, the appropriate remedy is to remand the matter to the plan administrator so that a "full and fair review" can be accomplished. Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 240 (4th Cir. 2008).

Smith contends that Liberty Life's decision to deny his claim was based on inadequate information and, therefore, the decision-making process was unsustainable. Smith further contends that the review of his claim was illusory because it rested on two factual errors or suspect rationales, a failure to consider the role of workplace stress on his disability, and a failure to take the necessary steps to resolve factual disputes.

Smith does not contend that Liberty Life failed to follow ERISA's procedural guidelines. Smith received his requested review upon written application to the Plan, and he received a written decision that included specific reasons for the decision. Smith's issues are, in essence, not related to failure to conduct a full and fair review process, but rather Smith contends that the substance of the review was not full and fair and that the claim denial was an abuse of discretion.

23

2.   Substantive

Smith argues that he is entitled to LTD benefits under the Plan, and his benefits were wrongly terminated because (1) the review relied on factual errors, (2) the role of workplace stress was not considered, and (3) the investigation was merely cursory.  The Court shall address each contention in turn.

a.   Factual Errors

In a December 30, 2013 letter to Smith denying his claim for disability benefits, Liberty Life wrote:

> The review states that the available information supports the diagnoses of major depressive disorder and generalized anxiety disorder. However, when asked to provide a description of your impairments, the reviewer advised that while impairment is supported from September 4, 2013 through October 1, 2013 due to difficulty in interpersonal functioning, there is no evidence of psychiatric impairment beyond October 1, 2013. It is of note that on November 1, 2013, Dr. Saunders documented that <u>you were stressed by the multiple tasks of buying a house, wanting to attend a nursing school and change working to part time</u>. He also wrote that your functioning seemed normal at home and mood was not depressed, although energy was low.

> To ensure complete understanding of your medical conditions and symptoms, the reviewing physician attempted to contact Dr. Saunders by phone on December 17th and December 24th. Messages were left after each attempt, however the call has not been returned.

24

AR 87 (emphasis added).  The highlighted information, noted as
reasons for finding no evidence of impairment beyond October 1,
2013, was inaccurate.  Smith was not buying a house; his son
was.  AR 95.  Smith did not want to attend nursing school; his
daughter did.  AR 95.  Smith was not planning on working part
time; his daughter was.  AR 95.

Defendants argue that Liberty's initial decision was not
based on these factual errors and that neither inaccuracy was a
factor in the final decision to deny Smith's appeal.  However,
independent of the misunderstanding, the evidence of record
reviewed by Dr. Segal included the following:

- Smith's statement of November 20, 2013 listed anxiety,
  panic, and depression as preventing him from working
  and interfering with his ability to concentrate.  AR
  56.

- Attending Physician's Statement on November 21, 2013.
  AR 60-61. On the form, Dr. Saunders indicated that
  Smith had a Class 4 Mental/Nervous Impairment,
  "Patient is unable to engage in stressful situations
  or engage in interpersonal relations (marked
  limitations)." AR 61.

- Dr. Saunders  also provided a medical summary letter
  dated December 4, 2013, which stated:

  He went off work and was advised to remain
  off work and avoid all stressors [u]ntil
  completely being recovered.  He was seen by
  me July 2013, September 2013, Oct 2013, and
  lastly 11-21-13.  At that tíme he was being
  treated with 2 antidepressants, an anti-
  anxiety medication, and a stimulant, and was
  in partial remission only.

In summary, he appears disabled from working in his previous employment, and also any employment at this time. AR 66.

- Dr. Saunders' notes from October 1, 2013, after Smith had been off work about one month, as noted by Dr. Segal in his analysis: "claimant's mood was good, sleep was better and that the claimant had no panic attacks."  AR 76.

- Dr. Saunders' notes from November 21, 2013, as noted by Dr. Segal in his analysis (excluding comments about buying a house and attending nursing school): "claimant's functioning seemed normal at home and mood was not depressed, although energy was low." AR 76.  Dr. Saunders added a prescription for a stimulant in addition to the two drugs already prescribed (antidepressant and sleep aid).  AR 76.  Dr. Saunders' notes also stated: "feels there's no way he could return, deal with people issues without return of depression," and commented that there were no stressful events, no communication with people at work, and anxiety, couldn't handle situations – multiple tasks.  AR 70, 77.

It is apparent from Dr. Segal's analysis that beyond October 1, 2013, Dr. Segal consistently attributed Smith's stress to the alleged "multiple tasks of buying a house and wanting to attend a nursing school and change working to part time."  AR 76.[11]  At the time of his report to Liberty Life, Dr. Segal had not spoken to Dr. Saunders.  AR 76.  Dr. Segal added

---

[11]    The Court also notes that in Dr. Segal's analysis, he refers to Smith as "her."  AR 76.  Although this may have been a mere typo, it may also indicate a level of carelessness especially when combined with the misinterpretation of the reasons for Smith's stress.

an addendum on December 24, 2013 to report that he had made additional efforts to contact Dr. Saunders.  AR 83.  In his addendum, Dr. Segal stated: "I reviewed this claim on December 17, 2013 and opined that t [sic] there was no evidence of social impairment since October 1, 2013. The claimant is apparently buying a house and is either thinking of attending nursing school or is already attending nursing school."  AR 83.

Certainly, in the ERISA context, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  However, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Id.

Based on the evidence that was before Liberty Life at the time of the decision, if the inaccuracies, and the misinterpretations made as a result by Dr. Segal, are removed, it appears there is a lack of substantial evidence to support the termination of benefits at October 1, 2013.

On the appeal, the following additional evidence was provided to Liberty Life:

- Smith's appeal letter of January 15, 2014 identifying the errors and clarifying the misunderstanding.  AR 94-95.  He also identified restrictions from Dr. Saunders that appeared to have not been taken into consideration.  AR 94-95.

- Dr. Segal updated the file with a memorandum stating that Dr. Saunders communicated that Smith "was better at a certain point 'because he was not working and did not have a stress of that particular job, and that is the reason for his improvement.' This information does not change my opinion as it is outlined in the original memorandum on December 17, 2013."  AR 84.

- Dr. Saunders response to Dr. Segal's December 17, 2013 letter with a brief hand-written sentence on the bottom of the letter stating: "Note- his symptoms improved when the stress was relieved! (<u>not</u> at work)".  AR 81.  In providing this update to the file, Dr. Segal noted that his communications with Dr. Saunders confirmed his original opinion. AR 119.

- An independent evaluation by Dr. Kalnins. AR 139-153.  In addition to reviewing the appeal file, Dr. Saunders' notes, and Dr. Segal's report, Dr. Kalnins spoke with Dr. Saunders on March 5, 2014, and summarized the conversation by letter dated March 6, 2014.  AR 139-140.  Dr. Saunders indicated that he disagreed with Dr. Segal, that his records had been misinterpreted, and that he did not consider Smith capable of returning to work.  AR 139-140.

- Dr. Kalnins' letter to Dr. Saunders indicates that she is operating under the false impression that Smith was considering going to nursing school.  AR 139.  This comment did not appear in her report to Liberty Life.

- In the letter to Dr. Saunders, Dr. Kalnins refers to an additional visit by Smith with Dr. Saunders in January 2014.  See AR 139 ("In November 2013 he was doing better at home. You had since increased alprazolam and added methylphenidate. You last saw him in January. You did not consider him capable of returning to a work setting until his condition was fully recovered.").  Reference is made to this visit in Dr. Kalnins' report to Liberty Life, although she did not note the medication change or that Dr. Saunders opinion in January 2014 was that Smith was not capable of returning to work.  AR 147. There are no corresponding notes by Dr. Saunders, and the visit wasn't listed in Dr. Kalnins' outline of records reviewed.  AR 145.

Dr. Kalnins did not speak with Smith.  Her report indicated that there was a lack of "objective evidence of severe and persistent depression, anxiety, panic attacks, cognitive difficulties, or interpersonal difficulties that would preclude the claimant from performing his occupational duties from 10/2/13 onward."  AR 149.  Liberty Life's denial letter of April 9, 2014, states:

> Although Dr. Saunders reports you are unable to work and your symptoms improved because you did not have the stress of "that particular job," reviewing physicians Dr. Segal and Dr. Kalnins report there is no evidence of psychiatric impairment beyond October 1, 2013.  Additionally, your treatment plan is not consistent with treatment expected for severe and impairing psychiatric symptoms.

AR 156.   Although Liberty Life still credits Dr. Segal's flawed

opinion,[12] Dr. Kalnins' report provides Liberty Life with some

additional supporting evidence for the conclusion that Smith is

not disabled after October 1, 2013.  It is unclear how much Dr.

Kalnins' opinion may have been influenced by Dr. Segal's report

or any false impression she had regarding Smith's considering

nursing school.


> ### b.   Role of Workplace Stress

The Plan defines disability by stating: "you are disabled

if your disability makes you unable to perform the material or

essential duties of your own occupation as it is normally

performed in the national economy."  AR 164.  In the appeals

denial letter of April 9, 2014, Liberty Life states:

> PNC reported in your job of Regional
> Manager II you were responsible for the day-
> to-day facilities management for multiple
> bank properties. In the definition of
> disability in The PNC Financial Services
> Group, Inc. Group Benefit Plan, occupation
> refers to the occupation that you were
> performing at the time your absence from
> work began. The Plan considers your
> occupation as it is normally performed in
> the national economy, rather than your
> specific job at PNC Financial Services
> Group.

---

[12]   Nothing in the record indicates that Dr. Segal was asked if
the corrected facts changed his opinion.

AR 155.  Neither Dr. Segal nor Dr. Kalnins make reference to whether Smith was able to perform his pre-disability occupation. Dr. Segal makes no reference to Smith's occupation. Dr. Kalnins indicates that she reviewed the "Job Description and/or Occupational Demands," AR 145, but makes no reference to Smith's ability to perform the functions of that occupation.  Further, there is no analysis in the record of the occupation "as it is normally performed in the national economy" as opposed to Smith's specific job.

Smith contends that Liberty Life failed to consider that the stress associated with his job was a major cause of his disability and that a return to that stress would likely cause a relapse of his impairment.  Certainly, there seems to be general agreement that it was the stress of the job that caused the crisis leading to his inability to function at work on September 4, 2013, and that Smith suffered from recurring major depression and anxiety disorder.  See, e.g., AR 156.  However, Dr. Segal and Dr. Kalnins both opine that the crisis ended less than a month later ("no later than October 1, 2013") when Dr. Saunders reported him as being in a better mood.  AR 76,148.

Yet Dr. Kalnins, for example, stated that the symptoms Smith exhibited prior to that date would interfere with his ability to "maintain stable emotions, make complex decisions,

concentrate adequately on complex tasks, and maintain stable interpersonal interactions." AR 148. Dr. Saunders plainly indicated that the symptoms improved because he was not at work. AR 81. It is reasonable to expect that Smith would require these abilities to perform his job, but there is nothing on the record to indicate that there was any review of the impact of Smith returning to work.

### c.   Cursory Investigation

The burden to prove disability rests on Smith. AR 172; see also Brodish v. Federal Express Corp., 384 F. Supp. 2d 827, 835 (D. Md. 2005)("in all or most plans, the burden of proving . . . disability is on the employee."). The initial burden of proof can be carried by Smith's subjective assessment and the statements of his treating physician that he was unable to return to work. See Clarke, 852 F. Supp. 2d at 679. "The administrator, of course, is not obligated to take the claimant's evidence at face value, and it may ultimately reject the evidence altogether and find that the claimant is not disabled. But, to do so, it must carry its own burden by pointing to substantial evidence that refutes the claimant's claim of disability." Id., see also Harrison v. Wells Fargo Bank, N.A., 773 F.3d 15, 21 (4th Cir. 2014) ("[T]he law

anticipates, where necessary, some back and forth between administrator and beneficiary.").

"Although independent reviews of medical evidence and independent examinations of claimants are not required, both are common in ERISA cases." Laser v. Provident Life & Acc. Ins. Co., 211 F. Supp. 2d 645, 650 (D. Md. 2002). Here, there was no independent examination of Smith. There is no evidence on the record that either independent reviewer ever spoke with Smith, although Dr. Saunders suggested to Dr. Kalnins that she do so. Dr. Segal did not even speak to Smith's examining physician prior to writing his initial report, which was used by Liberty Life in its decision for denial of benefits.[13] See AR 119.

In Zhou v. Met. Life Ins. Co, Judge Williams observed that "a claim of disability due to depression is fundamentally different from other types of disability claims that can be proved solely through a clinical medical record. Unlike a broken bone or a heart attack, depression is a disease which relies largely on self-reported symptoms." 807 F. Supp. 2d 458, 471-72 (D. Md. 2011). In Zhou, the court found that although there was no obligation to send the claimant for an independent

---

[13]    Dr. Segal did speak with Dr. Saunders after his initial report was submitted, and he updated his report with an addendum indicating his opinion had not changed despite Dr. Saunders stating that Smith was better "because he was not working and did not have a stress of that particular job, and that is the reason for his improvement." AR 84.

medical examination, in that case a reasonable review would have involved such an examination.  Id. at 474.  Judge Williams added,

> Because depression is a disease that encompasses inherently subjective complaints, it was inappropriate for MetLife to continually deny Plaintiff's claim based solely on the opinions of psychiatrists who merely reviewed Plaintiff's file, to the exclusion of statements and diagnoses by Plaintiff's treating physicians, and without an independent medical examination supporting the view of MetLife's psychiatrists.

Id.  Of course, the circumstances may be different in every case, but the observation is generally apt.

Under the circumstances of the instant case, where there is evidence provided by Smith, himself, and his treating physician, Dr. Saunders, that Smith is not capable of returning to work due to the stress and anxiety caused by work, more than a mere cursory file review is needed.  Liberty Life does not point to substantial evidence that refutes Smith's claim of disability nor supports its denial.  Liberty Life's conclusion to disallow the claim is arbitrary and capricious.

### 3.   Summary

A reasoned process and a complete record is necessary to support a decision with substantial evidence.  See Harrison, 773

F.3d at 21.  The record herein, as discussed, contained factual errors, and did not include analysis of Smith's ability to perform his occupation nor a review of the impact of returning to work on his ability to perform his occupation.  Not only was there no independent examination, but the independent reviewers did not even speak with Smith.  Liberty Life appears to have unreasonably relied on the independent reviews of the file and gave little credibility to Smith's own subjective reports or his treating physician's opinions.

Accordingly, the Court concludes that there is a lack of substantial evidence in the record to support Liberty Life's denial of Smith's claim for LTD benefits.


B.    Benefits and Legal Fees Payable

In the cross-motion for summary judgment, Smith states: "Under the terms of the Plan, [Smith] should be paid his full short-term disability benefit term (through December 4, 2013), and then two years of long-term disability benefits."  Mot. 15, ECF No. 34-1.[14]  Smith also requests reasonable attorneys' fees as a prevailing plaintiff under ERISA.

Defendants object and note that in any event, "the record indicates that Smith received STD benefits for the maximum

---

[14]    Note that in his Complaint, Smith asks for amounts payable from December 5, 2013.  Am. Compl. 8, ECF No. 11.

period allowed, through December 13, 2013. AR 10." Defs.' Reply at 11, ECF No. 41.[15] The dispute as to the amount of benefits to be paid remains pending.

ERISA provides for an award of attorney's fees, stating:

> "In any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).

The Fourth Circuit has identified a set of factors "that a district court should consider in informing its exercise of discretion when ruling on a motion for attorneys' fees in an ERISA case." Williams v. Metro. Life Ins. Co., 609 F.3d 622, 635 (4th Cir. 2010)(citing Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1029 (4th Cir. 1993)(en banc)).

The parties shall attempt to agree on the amount of benefits and any legal fees payable to Smith. Absent agreements, the Court shall make the determinations by further appropriate proceedings.


IV.  CONCLUSION

For the foregoing reasons:

1.  Defendants' Motion for Summary Judgment [ECF No. 31] is DENIED.

---

[15]  The date noted as 12/13/2013 by Defendants may be a typo, since AR 10 refers to 12/4/2013 as the "Date Ceased Receiving."

2.  Plaintiff's Cross-Motion for Summary Judgment [ECF No. 34] is GRANTED.

3.  Plaintiff shall be awarded all disability insurance benefits due and owing with interest.

4.  The parties shall attempt to reach agreement upon the amounts of benefits and legal fees to be awarded Plaintiff consistent with the instant decision.

4.  Plaintiff shall arrange a telephone conference to be held by August 4, 2017, to discuss matters requiring resolution prior to the entry of final judgment and to schedule such further proceedings as may be necessary.

SO ORDERED, on <u>Friday, July 21, 2017</u>.

_____/s/_____
Marvin J. Garbis
United States District Judge
